IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
October 4, 2018 Session Heard at Nashville

**SULLIVAN COUNTY, TENNESSEE, ET AL.**
**v.**
**THE CITY OF BRISTOL, TENNESSEE, ET AL.**

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Sullivan County**
**No. B0024737, K0039409   John C. Rambo, Chancellor**

———————————————————————

**No. E2016-02109-SC-R11-CV**

———————————————————————

This is one of five cases on appeal to this Court regarding the proper distribution of liquor-by-the-drink tax proceeds between a county and a municipality within the county. In each case, the county had not approved the liquor-by-the-drink sales, but the city had approved such sales. The Commissioner of the Tennessee Department of Revenue, who collects taxes on all liquor-by-the-drink sales, distributed tax proceeds to the defendant cities in accordance with the liquor-by-the-drink tax distribution statute, Tennessee Code Annotated section 57-4-306. The statute required the recipient cities to then distribute half of their proceeds "in the same manner as the county property tax for schools is expended and distributed." Tenn. Code. Ann. § 57-4-306(a)(2)(A) (2013). In each case, the recipient city distributed half of its tax proceeds to its own city school system and did not share the proceeds with the county. The counties sued the cities, claiming that the statute required the cities to distribute the tax proceeds as the counties distribute the county property tax for schools, which is pro rata among all schools in the county based on average daily attendance. In the instant case, the trial court granted summary judgment for the defendant cities. The Court of Appeals affirmed, concluding that the distribution statute was ambiguous and that the statutory framework, legislative history, and other sources supported the trial court's interpretation of the statute. Discerning no error, we affirm.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the
Court of Appeals Affirmed**

HOLLY KIRBY, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, SHARON G. LEE, and ROGER A. PAGE, JJ., joined.

Daniel P. Street, Blountville, Tennessee, for the appellants, Sullivan County Board of Education and Sullivan County, Tennessee.

K. Erickson Herrin, Johnson City, Tennessee, for the appellees, Cities of Bristol and Kingsport, Tennessee.

## OPINION[1]

The issues in this case are better understood with some knowledge of the development of the pertinent liquor-by-the-drink statutes. Consequently, we offer some background on the history of the statutes before we outline the facts and analyze the issues.

### The Liquor-By-The-Drink Act

During the years of federal prohibition (1920–1933), Tennessee had "bone dry" laws, which criminalized the sale, purchase, receipt, possession, transport, and manufacture of alcoholic beverages. *City of Chattanooga v. Tenn. Alcoholic Beverage Comm'n*, 525 S.W.2d 470, 472 (Tenn. 1975); Tenn. Op. Att'y Gen. 79-215 (May 3, 1979). After prohibition ended, Tennessee enacted a "local option" law authorizing counties to hold county-wide local option elections on whether to allow off-premises (package) sales of alcoholic beverages within their borders. *City of Chattanooga*, 525 S.W.2d at 472; *Chadrick v. State*, 137 S.W.2d 284, 285 (Tenn. 1940); *see also Templeton v. Metro. Gov't of Nashville & Davidson Cnty.*, 650 S.W.2d 743, 754 (Tenn. Ct. App. 1983). "The 'bone dry law' continued in effect in counties not electing to come under the provisions of the local option law." *City of Chattanooga*, 525 S.W.2d at 472; *see also Renfro v. State*, 144 S.W.2d 793, 794 (Tenn. 1940).

---

[1] This appeal was consolidated with four other cases for oral argument only, as we will discuss in more detail below.

In 1967, the Legislature passed comprehensive legislation related to liquor sales for on-premises consumption, i.e., liquor by the drink (hereinafter "LBD"). We refer to this as "the LBD Act." The LBD Act "authorize[s] the sale of intoxicating liquors by the drink for consumption on the premises, impose[s] taxes upon such sales[,] and provide[s] for the collection thereof." *Aetna Cas. & Sur. Co. v. Woods*, 565 S.W.2d 861, 865 (Tenn. 1978). Initially, the LBD Act allowed only the largest counties to hold local option elections. *See* Tenn. Code Ann. § 57-164 (1968). Gradually, in increments, the Act was amended to allow all counties—as well as all municipalities—to approve LBD sales by local option election. *See* 1987 Tenn. Pub. Acts, ch. 456 § 2; 1992 Tenn. Pub. Acts, ch. 711 § 1.

In any jurisdiction that approves LBD sales, such sales can lawfully be made by the establishments enumerated in the statutes, including restaurants, hotels, and sports facilities. *See* Tenn. Code Ann. § 57-4-101 (2013). Private clubs are among the enumerated establishments, but they are also permitted to sell LBD even in counties or municipalities that have not adopted LBD.[2]

Tennessee Code Annotated section 57-4-301(c) levies a 15% tax on all LBD sales.[3] Tenn. Code Ann. § 57-4-301(c) (2013). We refer to this as "the LBD tax." Retailers collect the LBD tax from consumers and then forward the tax proceeds to the Commissioner of the Tennessee Department of Revenue ("Commissioner"). *See* Tenn.

---

[2] This has been the case since at least 1972. Tennessee Code Annotated section 57-4-101(a)(2) authorizes private club sales "subject to the further provisions of [Chapter 4] *other than § 57-4-103*" (which makes Chapter 4 applicable to jurisdictions that have voted for LBD sales by referendum). Tenn. Code Ann. § 57-4-101(a)(2) (2013) (emphasis added). The italicized proviso has been interpreted to allow clubs to "legally sell alcoholic beverages by the drink throughout the state, whether or not the area in which such facilities are located are 'wet' or 'dry' for other purposes." Tenn. Op. Att'y Gen. 79-215 (May 3, 1979). The parties in this case do not dispute that private clubs may sell LBD regardless of whether the jurisdiction in which they are located has approved such sales.

[3] That subsection provides:

(c) In addition to the privilege taxes levied in subdivision (b)(1), there is further levied a tax equal to the rate of fifteen percent (15%) of the sales price of all alcoholic beverages sold for consumption on the premises, the tax to be computed on the gross sales of alcoholic beverages for consumption on the premises for the purpose of remitting the tax due the state, and to include each and every retail thereof.

Tenn. Code Ann. § 57-4-301(c) (2013 & 2018).

Code Ann. § 57-4-302 (2013 & 2018).  The Commissioner then distributes the LBD tax proceeds in accordance with the statute at issue in this case, Tennessee Code Annotated section 57-4-306.  We refer to this as "the distribution statute."

This case involves the application of the distribution statute as it existed prior to the enactment of a July 2014 amendment.[4]  The relevant versions of the distribution statute required the Commissioner to distribute 50% of all LBD tax proceeds to Tennessee's "general fund to be earmarked for education purposes."  Tenn. Code Ann. § 57-4-306(a)(1).  The Commissioner was directed to distribute the remaining 50% of the tax proceeds back "to the local political subdivision" that generated the proceeds.  *Id.* § 57-4-306(a)(2).

Important to this appeal, the remaining provisions of the distribution statute described what was to be done with the tax proceeds sent back to the originating local political subdivision.  The distribution statute said that half of those proceeds would go to the general fund of the county, city, or town in which the taxes were generated.  *Id.* § 57-4-306(a)(2)(B).  The other half, the distribution statute stated, "shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed."  *Id.* § 57-4-306(a)(2)(A).  Interpretation of this provision is the issue presented to us in this case.

### Sullivan County

The underlying facts in this case are essentially undisputed.  The Cities of Bristol and Kingsport (collectively, "the Cities") are located in Sullivan County.[5]  The Cities have at all relevant times had their own municipal school systems separate from the Sullivan County school system.

In 1984, citizens of both Cities passed referendums authorizing LBD sales within their city limits.  The County has never passed a referendum regarding LBD sales.

---

[4] The distribution statute was amended substantially effective July 1, 2014, after the five lawsuits herein were filed.  *See* 2014 Tenn. Pub. Acts, ch. 901 § 1 (H.B. 1403).  Unless otherwise specified, references to the distribution statute are to the version in the 2013 volume of the Tennessee Code Annotated, which sets forth the statute as it existed at the time these lawsuits were filed and before the July 2014 amendment.

[5] The City of Kingsport is also located in part in Hawkins County, but Hawkins County is not a party to this appeal.

However, since at least 1980, private clubs have legally sold LBD in the Cities and in unincorporated areas of the County.

On May 30, 2014, the Sullivan County Board of Education and Sullivan County filed separate complaints against the Cities. Both sought declaratory judgment as to the rights and obligations of the parties concerning LBD tax proceeds. The cases were ultimately consolidated. Hereinafter we refer to the Sullivan County Board of Education and Sullivan County collectively as "the County."

The County also sought damages from the Cities for its pro rata share of LBD tax proceeds distributed to the Cities since 1980.[6] The County alleged that the distribution statute required the Cities to remit half of their LBD tax proceeds to the County, to distribute pro rata among all schools in the County.

The Cities denied liability. They also asserted counterclaims against the County based on distribution reports attached to the County's complaints. The distribution reports showed that the County had been receiving LBD tax proceeds from the sale of LBD in private clubs for many years, but that it had never redistributed those proceeds pro rata to the other schools in the County. The Cities claimed in their counterclaims that the County owed them damages for their pro rata share of LBD tax proceeds unlawfully withheld.[7]

Subsequently, the parties filed cross-motions for summary judgment. In their joint motion for summary judgment, the Cities argued that the distribution statute was ambiguous and that the statute's legislative history and longstanding rules of statutory construction supported a ruling in the Cities' favor. In its motion, the County asserted that the plain language of the distribution statute required the Cities to distribute their LBD tax proceeds pro rata across all schools in the County.

In February 2016, the trial court entered an order granting the Cities' motion for summary judgment and denying the County's motion on the main allegations in the County's complaint. The trial court first concluded that the distribution statute was unambiguous in favor of the Cities' interpretation. The County's interpretation, the trial

---

[6] The County sought $758,239 in damages from Bristol and $1,340,037 from Kingsport.

[7] In their counterclaims, Bristol alleged damages of $88,000, and Kingsport alleged damages of $245,000.

court reasoned, required a two-part distribution scheme, whereby the Commissioner would distribute LBD tax proceeds to the Cities, and then the Cities would be required to distribute half of those proceeds in accordance with an average daily attendance formula. "Nowhere does the language require the municipalities to distribute the funds according to the average daily attendance." The trial court also concluded that the distribution statute plainly did not require the Cities to turn over half of their LBD tax proceeds to the County for redistribution, because this would require "a third distribution scheme" that is not required by the statute.[8] For these reasons alone, the trial court held, the Cities were entitled to summary judgment. In the alternative, the trial court said that, even if the statute were ambiguous, the legislative history supported the trial court's conclusion that cities operating their own school systems were not required to share their LBD tax proceeds with county schools.

The Cities then filed a joint motion for summary judgment on their counterclaims against the County. In September 2016, after discovery and further briefings by both parties, the trial court entered an order granting summary judgment for the Cities. It ordered the County to pay $107,286 to Kingsport and $75,802 to Bristol, amounts that reflected each City's pro rata share of the undistributed private club LBD tax proceeds received by the County between 1980 and 2013. The County appealed the trial court's grant of summary judgment on its claim for LBD tax proceeds, but it did not challenge the trial court's grant of summary judgment on the Cities' counterclaims.[9]

Around the same time, three other cases involving the same issue regarding the distribution statute were appealed to the Court of Appeals for the Eastern Section. *See Blount Cnty. Bd. of Educ. v. City of Maryville*, No. E2017-00047-COA-R3-CV, 2017 WL 6606855 (Tenn. Ct. App. May 26, 2017) ("*Blount Cnty.*"); *Bradley Cnty. Sch. Sys. ex rel. Bradley Cnty. Bd. of Educ. v. City of Cleveland*, No. E2016-01030-COA-R3-CV, 2017 WL 6598557 (Tenn. Ct. App. Dec. 27, 2017) ("*Bradley Cnty.*"); *Washington Cnty. Sch. Sys. ex rel. Washington Cnty. Bd. of Educ. v. City of Johnson City*, No. E2016-02583-COA-R9-CV, 2017 WL 6603656 (Tenn. Ct. App. Dec. 27, 2017) ("*Washington Cnty.*"). A motion to consolidate was filed, and the Court of Appeals for the Eastern Section entered an order "granting the motion 'only to the extent that these cases shall be set for

---

[8] The trial court determined that, even though the distribution statute did not apply to Sullivan County for purposes of receiving LBD tax proceeds from the Commissioner, "Sullivan County is not precluded by section 57-4-103(a)(1) from receiving [LBD] tax revenue."

[9] The trial court's ruling on the Cities' counterclaims is not at issue in this appeal. The County concedes in its appellate brief that "it should have shared its [LBD] tax revenue with [the] Cities."

oral argument on the same docket and on the same day.'" *Sullivan Cnty. v. City of Bristol*, No. E2016-02109-COA-R3-CV, 2017 WL 6598559, at *3 (Tenn. Ct. App. Dec. 27, 2017) (quoting order). Pursuant to the order, the intermediate appellate court held arguments in this case and in the three other cases on the same day before the same panel of judges.

On December 27, 2017, the Eastern Section panel of the Court of Appeals contemporaneously issued separate decisions in all four cases, including this one, holding in favor of the city defendants.[10] *See Sullivan Cnty.*, 2017 WL 6598559, at *17; *see also Blount Cnty.*, 2017 WL 6606855, at *21; *Bradley Cnty.*, 2017 WL 6598557, at *17; *Washington Cnty.*, 2017 WL 6603656, at *17. The appellate court first determined that the distribution statute was ambiguous regarding whether cities that operate their own school systems were required to remit a portion of their LBD tax proceeds to their counties when the counties had not approved LBD sales by referendum. *See Sullivan Cnty.*, 2017 WL 6598559, at *8; *Blount Cnty.*, 2017 WL 6606855, at *9; *Bradley Cnty.*, 2017 WL 6598557, at *8; *Washington Cnty.*, 2017 WL 6603656, at *10. After considering the statutory framework, legislative history, and other sources, the Eastern Section panel held that the distribution statute directed the cities to expend and distribute half of their LBD tax proceeds in the manner in which the county property taxes would be expended and distributed *within the cities*, that is, for the benefit of the cities' own school systems. *See Sullivan Cnty.*, 2017 WL 6598559, at *17; *Blount Cnty.*, 2017 WL 6606855, at *21; *Bradley Cnty.*, 2017 WL 6598557, at *17; *Washington Cnty.*, 2017 WL 6603656, at *17.

About a month later, on January 23, 2018, the Court of Appeals for the Middle Section reached the opposite conclusion in a factually similar case. *Coffee Cnty. Bd. of Educ. v. City of Tullahoma*, No. M2017-00935-COA-R3-CV, 2018 WL 522423, at *4 (Tenn. Ct. App. Jan. 23, 2018). In *Coffee County*, the Middle Section panel acknowledged the four decisions issued by the Eastern Section panel but disagreed with the analysis in those decisions. *Id.* at *3-4 (noting that it did "not disagree with [its] learned cohorts lightly"). Rather, the Middle Section panel deemed the distribution statute unambiguous and held that, on its face, the statute plainly required municipalities to distribute the tax proceeds in the same manner that the counties distribute county property taxes for schools. The Middle Section declined to consider anything outside the text of the specific provision. *Id.* at *3.

---

[10] The decisions were all issued by the same appellate panel, and the legal analysis is substantively identical in each opinion.

We granted permission to appeal in this case and in the four similar cases arising out of both the Eastern and Middle Sections of the Court of Appeals to resolve the split among the appellate courts on the proper interpretation of the distribution statute.[11]

## STANDARD OF REVIEW

We review a trial court's ruling on a motion for summary judgment de novo without a presumption of correctness in the lower court's decision. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015) (citing *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04; *Rye*, 477 S.W.3d at 250.

As we have indicated, the relevant facts in the instant appeal are undisputed, and the issues involve only the interpretation of statutes. Issues of statutory interpretation are questions of law, which are also reviewed de novo without a presumption of correctness. *Beard v. Branson*, 528 S.W.3d 487, 494-95 (Tenn. 2017) (quoting *Kiser v. Wolfe*, 353 S.W.3d 741, 745 (Tenn. 2011)); *Circle C Constr., LLC v. Nilsen*, 484 S.W.3d 914, 917 (Tenn. 2016).

## ANALYSIS

The primary issue on appeal involves the proper interpretation of the distribution statute as it existed when this lawsuit was filed in May 2014.[12] At that time, the statute read:

---

[11] This case was consolidated with the other four cases for oral argument only. This opinion resolves only the dispute between Sullivan County and the Cities of Bristol and Kingsport. Separate opinions are being issued in each of the other four cases.

[12] As noted above in footnote 4, the distribution statute was amended substantially in July 2014, after this lawsuit was filed. *See* 2014 Tenn. Pub. Acts, ch. 901 § 1 (H.B. 1403). As explained in *Coffee County*, however, we need not delve into the particulars of the amendment because it does not apply in this case and it does not inform our interpretation of the pre-July 2014 versions of the statute. *See Coffee Cnty. Bd. of Educ. v. City of Tullahoma,* No. M2017-00935-SC-R11-CV, slip op. at 22 (Tenn. May 8, 2019).

(a)  All gross receipt taxes collected under § 57-4-301(c) shall be distributed by the commissioner as follows:

(1)  Fifty percent (50%) to the general fund to be earmarked for education purposes; and

*(2)  Fifty percent (50%) to the local political subdivision as follows:*

*(A)  One half (1/2) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed*; provided, however, that except in [Bedford County][13] any proceeds expended and distributed to municipalities which do not operate their own school systems separate from the county are required to remit one half (½) of their proceeds of the gross receipts liquor-by-the-drink tax to the county school fund; and

(B)  The other one half (1/2) shall be distributed as follows:

(i)  Collections of gross receipts collected in unincorporated areas, to the county general fund; and

(ii)  Collections of gross receipts in incorporated cities and towns, to the city or town wherein such tax is collected.

Tenn. Code Ann. § 57-4-306(a)(1)–(2) (2013) (emphasis added).  The italicized portion of the statute, which we call "the local education provision," is the specific provision in dispute in this case.  The question is whether municipalities with their own school systems were required to expend and distribute their LBD tax proceeds with other schools in the county pro rata, that is, "in the same manner as the county property tax for schools is expended and distributed" by the county.  *Id.* § 57-4-306(a)(2)(A) (2013).

---

[13] It is undisputed that the statutory language omitted and replaced by the bracketed language describes the population parameters of Bedford County.

We examined the proper interpretation of the distribution statute at length in *Coffee County*, the case arising out of the Middle Section Court of Appeals and released on the same date as this opinion. *See Coffee Cnty. Bd. of Educ. v. City of Tullahoma*, No. M2017-00935-SC-R11-CV, slip op. at 22 (Tenn. May 8, 2019) (hereinafter "*Coffee Cnty.*"). After fulsome analysis, we concluded in *Coffee County* that the local education provision in the distribution statute "required a municipality with its own school system to expend and distribute half of its LBD tax proceeds in the same manner that the county property tax for schools is expended and distributed within the municipality, which is for the benefit of the municipality's own school system." *Id.* at 22. In that case, because the City of Tullahoma had its own school system, we held that the city "was not required to share its LBD tax proceeds with the [c]ounty" during the relevant time period.[14] *Id.* at 22.

The County concedes that the distribution statute required it to distribute part of its private club LBD tax proceeds to the Cities. It claims that, under the distribution statute, the Cities should in turn be required to share their LBD tax proceeds with the County. We rejected a similar argument in *Blount County*, one of the four parallel Eastern Section cases on this issue.[15] In *Blount County*, we noted that disparity under the distribution statute between what is required of a county and what is required of a city is logical because "the citizens of [the cities] are necessarily also citizens of [the county]. But the reverse is not true at all. [The] citizens of [the county] that live outside [the cities] are not citizens of [the cities]." *See Blount Cnty. Bd. of Educ. v. City of Maryville*, No. E2017-00047-SC-R11-CV, slip op. at 12 (Tenn. May 8, 2019) (quoting trial court). The manner

---

[14] The County in this case argues that its interpretation should prevail based on the similarities between the language in the distribution statute and a provision in the Local Option Revenue Act (LORA), which was enacted four years before the LBD Act. *See* 1963 Tenn. Pub. Acts., ch. 329 § 4; Tenn. Code Ann. § 67-6-712(a)(1) (2018) (providing that half of the taxes levied under LORA are to be distributed to the county trustee and that one half of those proceeds "shall be expended and distributed in the same manner as the county property tax for school purposes is expended and distributed"). We rejected this argument in *Coffee County* noting that, although this LORA provision is nearly identical to a part of the local education provision, "the taxes involved in the statutes are substantially different from each other, and the LORA statute does not have a '1982 proviso' counterpart." *Coffee Cnty.*, slip op. at 14 n.21.

[15] In *Blount County*, the county raised the alternative argument that, if the defendant cities were not required to share their LBD tax proceeds, then it was entitled to reimbursement of private club LBD tax proceeds that had previously been paid to the defendant cities. We disagreed based on our analysis in *Coffee County*. *See Blount Cnty. Bd. of Educ. v. City of Maryville*, No. E2017-00047-SC-R11-CV, slip op. at 11-12 (Tenn. May 8, 2019).

- 10 -

in which counties and cities are required to distribute LBD tax proceeds, we noted, is a decision that was "within the Legislature's prerogative to make."[16] *Id.*

Thus, the issue presented here is substantively indistinguishable from the issue decided in *Coffee County*. Based on our holding in *Coffee County*, we hold that the distribution statute did not require the Cities to share half of their LBD tax proceeds with the County and other school systems in the County pro rata. Rather, the local education provision directed the Cities to expend and distribute the education portion of their LBD tax proceeds in support of their own municipal school systems.

Accordingly, we affirm the trial court's grant of summary judgment in favor of the Cities. All other issues raised on appeal and not specifically addressed herein are pretermitted by our decision.

## CONCLUSION

The decisions of the trial court and the Court of Appeals are affirmed. Costs on appeal are to be taxed to Appellants Sullivan County Board of Education and Sullivan County, as well as their surety, for which execution may issue, if necessary.

_____
HOLLY KIRBY, JUSTICE

---

[16] As we noted in *Coffee County*, our interpretation of the distribution statute is not based on the perceived "fairness" of that statute. *Coffee Cnty.* slip op. at 22-23 n.29. Any "argument concerning perceived fairness of the tax distribution scheme provided by the statute would properly be directed to the General Assembly rather than to this Court." *See Sullivan Cnty.*, 2017 WL 6598559, at *17; *see also Blount Cnty.*, 2017 WL 6606855, at *18; *Bradley Cnty.*, 2017 WL 6598557, at *16; *Washington Cnty.*, 2017 WL 6603656, at *17.

- 11 -